MAKAR, J.,
concurring.
An ongoing challenge to the delivery of health care services nationwide and in Florida is the broadening and deepening range of the workforce that speaks different primary languages. Language access for persons of limited English proficiency (LEP) seeking health care services is governed by a continually evolving legal framework,[1] one that includes federal civil rights and disability laws (which generally prevent discrimination against persons whose primary language is not English in federally-funded health and human services programs) as well as state laws (which range from comprehensive language laws (e.g., California) to discrete laws addressing situations such as mandating interpreters for commitment proceedings (e.g., Illinois)).[2]
Making health care services more accessible to LEP patients, as one might expect, is a Herculean and glacial task. One reason is the sheer multiplicity of languages. About 337 languages are spoken in the United States, twenty-four of which have over 200,000 speakers;[3] Florida’s language diversity is equally impressive.[4] Attempting to accommodate access to health care information and services to this wide-ranging landscape of languages is of obvious difficulty, requiring complicated policy decisions at the federal and state levels that take time to analyze, make, and then implement.
A related reason is the determination of how language access is to be achieved, *225 a factor driven to some extent by the cost and supply of health care resources. Claimants justifiably want medical providers with whom they can communicate effectively in their primary languages, but the supply of and cost for meeting this demand can be limited and prohibitive, respectively. In an ideal world with unlimited resources, patients would have health care information published in their own primary languages, and their health care service providers would speak their primary languages. Because this ideal is unattainable, the trajectory of the language access movement in the United States currently has gravitated to the use of translators (for written communication) and interpreters (for verbal communication) in the medical context; typically — but not always — translators and interpreters convert communications in the English language into the primary language of the patient, which is consistent with language demographics. For example, 73% of Florida’s population speaks English at home as its primary language and about 75% of those whose primary language is not English speak English “very well” or “well.”[5] Even then, states have focused primarily on improving language access in communications involving patient education, informed consent, and specific medical conditions.[6] “Less commonly, states have enacted laws mandating provision of language assistance services [including translators and interpreters], typically either through specific types of facilities, or as a condition of licensure.”[7] This expansion over time of the use of translators and interpreters has led to the deployment of continuing education programs that focus on language access and cultural awareness issues that impact the provision of health care services; it has also spawned a movement toward certification of health care interpreters.[8]
All this said, not a single law or program, federal or state, appears to create an entitlement for LEP patients to a health care provider who speaks the patient’s primary language. Instead, it appears that the governing standard is that an interpreter is used when required to ensure non-discrimination in the delivery of medically necessary health care services.
This standard prevails in the workers’ compensation context in Florida, which distinguishes between what is medically desirable versus what is “medically necessary,” the latter being the statutory standard that applies to determine whether a particular medical service is justified. The statute states that claimants are entitled to services that are “medically necessary” or a “medical necessity” both of which are defined to mean:
any medical service or medical supply which is used to identify or treat an illness or injury, is appropriate to the patient’s diagnosis and status of recovery, and is consistent with the location of service, the level of care provided, and applicable practice parameters. The service should be widely accepted among practicing health care providers, based *226 on scientific criteria, and determined to be reasonably safe. The service must not be of an experimental, investigative, or research nature.
§ 440.13(k), Fla. Stat. (2014). Determining medical necessity is a multi-factored inquiry, but one that emphasizes: (1) consistency with practice parameters in the profession, and (2) whether the medical service is “widely accepted among practicing health care providers.” Id.
In this case, Mr. Trejo-Perez — who suffers from severe injuries — needs a psychiatric evaluation. The services of a qualified psychiatrist and a Spanish language interpreter have been made available for this purpose. He has rejected those services, however, claiming that he is entitled statutorily to a psychiatrist who speaks his primary language based on the testimony of Dr. Angelo M. Alves, who asserts an evaluation by a Spanish-speaking psychiatrist is a “must” in Mr. Trejo-Perez’s case.
The sole legal question is whether Dr. Alves’s testimony compels the provision of the Spanish-speaking psychiatrist as “medically necessary” under the statute. Undoubtedly, patients and physicians desire to speak in a common language to avoid potential miscommunication; this commonality is highly desirable whether the physician is a gastroenterologist, ophthalmologist or a psychiatrist. Linguistic desirability, however, is not medical necessity absent a specific showing that the use of an interpreter is inconsistent with prevailing practice parameters and that a linguistieally-compatible psychiatrist is a widely accepted practice among those practicing in this field.
In this regard, no evidence in the record addresses whether use of a linguistieally-compatible interpreter is incompatible with prevailing practice parameters in the provision of health care services generally or psychiatric services specifically. Likewise, the record is silent on whether the field of psychiatry has adopted — as a widely accepted practice — a requirement that patients are entitled to a primary-language-speaking psychiatrist. On this basis alone, it was proper to conclude that the provision of a qualified psychiatrist, coupled with an interpreter, met prevailing standards of care.
Dr. Alves’s testimony addressed neither of the two statutory requirements. While saying it is “a must in this case” to “exactly evaluate the degree” of memory loss and cognitive impairments, his justification was that using an interpreter could result in “the wrong information” because “[y]ou have to communicate with the patient.” But this rationale is one that applies to any medical specialty. Nothing in the record shows that the use of an interpreter in this context is sufficiently different from other specialties to conclude that a linguistieally-compatible psychiatrist is medically justified. Physicians have to communicate with patients, and accurate information is important; but Dr. Alves’s testimony falls short of establishing the “medical necessity” of his recommendation.
That said, Dr. Alves recommendation of a Spanish-speaking psychiatrist is not a mere velleity. Linguistic nuances may have greater medical importance in the psychiatric context versus other medical specialties; circumstances may exist where a linguistieally-compatible psychiatrist is so important in a particular context as to be “medically necessary” within Florida’s statutory definition. But medical necessity must be based on more than linguistic desirability under the existing statutory standard, which requires a practice be widely accepted and prevailing, in the medical community. With these observations, I concur in Judge Marstiller’s opinion.

. See generally Alice Hm Chen et al., The Legal Framework for Language Access in Healthcare Settings: Title VI and Beyond, 22 J. of Gen. Int. Med. 362 (Supp. 2 2007) (providing a general overview of federal and state laws related to language rights in the health care market) (last visited May 8, 2014).

. See generally Jane Perkins & Mara Youde-lan, Summary of State Law Requirements Addressing Language Needs in Health Care, National Health Law Program at 4 (Jan. 2008), available at http://www.healthlaw.org/ publications/summary-of-state-law-requirements-addressing-language-needs-in-health-care (compiling and providing "citation to and a short description of each state’s statutes and regulations regarding services to LEP persons in health care settings.”) (last visited May 8, 2014).

. See Languages of the United States, Wikipedia, http://en.wikipedia.orgAviki/Languages_ of_the_United_States# MainJanguages (last visited May 8, 2014).

. See Florida, Wikipedia, http://en.wikipedia. org/wiki/Florida (last visited May 8, 2014).

. See Modem Language Association Language Map Data Center, http://www.mla.org/ map_data (search of Florida for the year 2010) (last visited May 8, 2014).

. Chen, supra note 1, at 364.

. Id.

. See Alvaro DeCola, Making Language Access to Health Care Meaningful: The Need for a Federal Health Care Interpreters’ Statute, 24 J.L. & Health 151, 154 (2010) ("Language access barriers will not be overcome unless new statutory guidance is enacted that addresses both national standards for medical interpreters and translators, and procedures to strictly enforce current federal laws related to language access.”).